United States Steel Corporation, Appellant, *v.*
Board of Assessment and Revision
of Taxes, Appellant.

464

Argued November 15, 1965. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Theodore R. Mann,* with him *Robert K. Greenfield, Robert E. Slota,* and *Folz, Bard, Kamsler, Goodis & Greenfield,* and *Cadwallader, Darlington & Clarke,* for Falls Township School District.

*Samuel M. Snipes,* and *Snipes & White,* for Falls Township.

*Henry T. Reath,* with him *Claude C. Smith, George T. Kelton,* and *Duane, Morris & Heckscher,* and *Begley, Carlin, Mandio, Kelton & Popkin,* for steel company, taxpayer.

*Samuel S. Gray, Jr.,* County Solicitor, for Board of Assessment and Revision of Taxes of Bucks County.

OPINION PER CURIAM, September 27, 1966:

These are cross appeals from orders of the lower court affirming and modifying certain real estate tax assessments on the Fairless Works, a steel mill owned by United States Steel Corporation (Steel). The parties other than Steel are the Board of Assessment and Revision of Taxes of Bucks County (Board), the School

District of Falls Township and the Board of Supervisors of Falls Township (Intervenors).

The assessments in question concern the years 1960 through 1963. The relevant taxing statute is §602 of The Fourth to Eighth Class County Assessment Law,[1] Act of January 18, 1952, P. L. (1951) 2138, as amended, 72 P.S. §5453.602 (1965 p.p.), which provides in pertinent part: "(a) It shall be the duty of the chief assessor to assess, rate and value all subjects and objects of local taxation . . . according to the actual value thereof . . . . After there has been established and completed for the entire county the permanent system of records consisting of tax maps, property record cards and property owner's index, as required by section three hundred six of the act herein amended, real property shall be assessed at a value based upon an established predetermined ratio, of which proper notice shall be given, not exceeding seventy-five per centum (75%) of its actual value or the price for which the same would separately bona fide sell . . . . In arriving at such value, the price at which any property may actually have been sold shall be considered, but shall not be controlling. Instead, such selling price estimated or actual shall be subject to revision by increase or decrease to accomplish equalization with other similar property within the county. After the completion of the permanent system of records for the county, when assessing real property, the chief assessor shall also take into consideration the value of such property as indicated by the use of the permanent system of records, cost charts and land values applied on the basis of zones

---

[1] On January 1, 1962, Bucks County was reclassified from a fifth class to a third class county. Nonetheless, The Fourth to Eighth Class County Assessment Law has remained in effect for real estate taxation assessment purposes in Bucks County, by reason of the Act of July 29, 1953, P. L. 974, as amended, 72 P.S. §5347 (1965 p.p.).

and districts as well as the general adherence to the established predetermined ratio." We have held that, within the meaning of statutes of this nature, the term "actual value" refers to market value. *Baldwin-Lima-Hamilton Corporation Appeal,* 412 Pa. 299, 194 A. 2d 434 (1963); *Buhl Foundation v. Board of Property Assessment, Appeals and Review,* 407 Pa. 567, 180 A. 2d 900 (1962). As defined by this Court, market value is " ' " the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." ' " *Buhl Foundation v. Board of Property Assessment, Appeals and Review,* supra at 570, 180 A. 2d at 902. The record reveals that the Board's assessments were founded upon the statutory standard and were in such sufficient compliance therewith that they may not be overturned for lack of adherence to the statutory concept of actual value. Accordingly, the attempt on the part of Steel to apply depreciated reproduction cost as the value-fixing standard must fail. As we indicated in both *Baldwin-Lima* and *Buhl Foundation,* supra, and on numerous other occasions, reproduction cost has no probative value for any purpose in fixing the fair market value of improved real estate for tax purposes.

If that were the only basis upon which the Board's assessment might be assailed, we would be required to uphold the Board's valuation and disregard the lower court's modification. Nonetheless, there is cause to modify the assessment. In *Jones & Laughlin Tax Assessment Case,* 405 Pa. 421, 175 A. 2d 856 (1961), we held that improvements, whether fast or loose, which (1) are used directly in manufacturing the products that the establishment is intended to produce; (2) are necessary and integral parts of the manufacturing process; and (3) are used solely for effectuating that pur-

pose are excluded from real estate assessment and taxation. On the other hand, we indicated, improvements which benefit the land generally and may serve various users of the land are subject to taxation. Likewise, structures which are not necessary and integral parts of the manufacturing process are subject to taxation. In *Jones & Laughlin,* we had occasion to discuss the nature of the steel industry, and we observed that out of necessity most of the equipment used in the manufacture of steel is large, heavy and securely entrenched with solid foundations. Those observations are equally applicable to the instant matter. Applying the principles of *Jones & Laughlin,* the court below excluded from taxation the following items which the Board had assessed: the railroad track used exclusively in manufacturing; the craneways for overhead cranes; the ore yard; the blast furnace and stock bins; the slag pits; the sintering plant; the ore screening station; the coke screening station; the open hearth charging platforms; the soaking pit platforms; the catwalks and special stairways; and the blast furnace cast houses. We agree with the court below on certain items and disagree on others.

Without involving this opinion with a lengthy discussion of the process by which steel is made, we will simply note that the components of steel are iron ore, coke and limestone. After its arrival at the steel works, the iron ore is mixed and blended until the proper grade is produced. The coke is processed from coal, which is heated and quenched until it turns into coke; the coke is then refined until the particles reach the proper size for blending with the iron ore and limestone. These three basic materials are processed into molten steel, which is poured into various molds to form ingots of raw steel, which ingots are further fabricated into numerous shapes, sizes, types and grades of the finished steel product. A valuable by-product of

this operation is slag, which itself is of important industrial use. Each of the structures and items of machinery and equipment excluded from assessment by the lower court plays its role in this remarkable process. Some satisfy the three-fold ruling of *Jones & Laughlin;* others do not. We shall examine each and determine which items should be assessed for taxation purposes.

That portion of the railroad track used exclusively in manufacturing serves as a massive conveyor belt for the Fairless Works whereby materials essential to the steel manufacture process are transferred from one processing station to the next. Its function is the same as that of a standard sized conveyor belt in a factory which turns raw material into a finished product. Clearly, this trackage is excluded from taxation under the *Jones & Laughlin* standard.

The craneways for overhead cranes provide support for the rails upon which massive overhead cranes move through the buildings carrying iron, steel and other in-process products. If the railroad track serves as a conveyor belt between processing stations, then the craneways serve the same function within a station. These craneways, although attached to the supporting columns of the buildings, provide no support as such therefor and are not subject to assessment.

The ore yard facilities—located between the vessel slip and the blast furnaces—"are used not only as a transshipments and temporary storage area (providing a 'surge' or reserve capacity for a three to ten days' supply of ore for the blast furnaces) for iron ore as discharged from the water or rail carriers, but also constitute receptacles used fundamentally and primarily for the programmed spreading, layering and blending of the nonuniform shipments of grades and sizes of ore received in various cargoes, so as to achieve uniformity for processing in respect to chemical analysis

and physical characteristics. On the floor of the ore yard is located movable crushing machinery used in the processing of the ore."[2] and "[t]he ore yard facilities are peculiarly designed for and used directly in the manufacturing process for the production of iron. They are a necessary and integral part of the equipment used in such processes and, except for the incidental and temporary storage feature, are availed of solely for such purposes."[3] The evidence of record fully supports these findings and conclusions of the court below. While these ore yards may be used for *temporary* storage[4] such use is minimal and purely incidental to their use as necessary and integral parts of the process of manufacturing steel. Neither *Jones & Laughlin Tax Assessment Case,* 405 Pa. 421, 175 A. 2d 856 (1961) nor *Gordon Lubricating Co. v. Allegheny County Board of Property Assessment, Appeals and Review,* 204 Pa. Superior Ct. 441, 205 A. 2d 704 (1964), aff'd per curiam, 418 Pa. 625, 211 A. 2d 284, require that, under the evidence on this record, these ore yards be held taxable; more particularly these ore yards *do not fall* within the ambit of the language of our Court in *Jones & Laughlin* (at page 432) : "A structure used for storage, for example, is part of the realty and subject to real estate taxation". Clearly, as the court below concluded, these ore yards should be excluded from taxation.

The blast furnace stock bins—immediately adjacent to the ore yard and the blast furnaces—were well described by the court below: "The blast furnace stock bins are steel structures which contain surge receptacles designed for the in-process purpose of assembling and temporarily holding the various materials used directly to supply the blast furnaces themselves. Iron

---

[2] Portion of Finding of Fact 29.

[3] Finding of Fact 30.

[4] Steel has large facilities for ore storage for this plant in the Philadelphia area.

ore, limestone and other ingredients are carried or deposited into the blast furnace stock bins through grids or openings in a railway trestle which is supported by the stock bins structure. Each such material is then drawn by gravity from the bins in a pre-determined amount into special-purpose cars, weighed and ultimately transported to, and charged or deposited within, one of the three blast furnaces. While these bins have an incidental, temporary or 'in-transit' storage aspect, their primary purpose is to serve directly as a material-handling facility for the gathering, combining and mixing of raw materials in the process flow to the blast furnaces."[5] The court below, with full evidentiary support of record, concluded factually: "The blast furnace stock bins are designed for and serve as an integral and essential part of the material handling system and as such are used directly and solely in the manufacture of iron."[6]

These bins are not, in the main, storage facilities and we agree with the court below they must be excluded from taxation.

The slag pits are located behind the blast furnaces and serve to receive the molten slag as it is discharged from the blast furnace. The slag deposited in the pits is treated by a water-cooling system built into the concrete walls. Slag is an industrially valuable by-product of the iron making process. The lower court found that the slag pits constitute equipment which serves an integral and essential part of the production of slag, and are used directly and solely in the manufacturing process. The cooling process performed by the slag pits produces slag of the required texture and is part of the manufacturing process. We agree with the lower court that these pits should not be assessed.

---

[5] Finding of Fact 33.

[6] Finding of Fact 34.

The sintering plant, ore screening station and coke screening station are vast machines constructed high in the air on steel superstructures and foundations. These facilities process ore and coke for use in the blast furnaces. The roof and siding on each are parts of the machinery and would collapse if the inner machinery were removed. These facilities should be excluded from assessment as they clearly qualify as nontaxable under *Jones & Laughlin*.

The open hearth charging platforms are elevated platforms (20-25 feet high) located in the open hearth building. They are used to support machines and cars which run on tracks imbedded in the platforms and which carry materials into the open hearth furnaces. The platforms are removable, are supported independently of the building, and add no structural strength thereto. They are alike in function to the craneways for overhead cranes, which, we have said, are analogous to over-sized conveyor belts and are not assessable. Likewise, these platforms should not be taxed.

The soaking pits platforms are elevated steel platforms located in the soaking pits building. They are supported by their own foundations and certain of the steel building columns. They are located above the soaking pits and provide no support for the soaking pits building. The soaking pits serve to reheat the steel ingots after they have been removed from their molds and prior to their being fabricated into the desired shapes and sizes. The platforms provide support for the soaking pits control equipment and access for personnel to that equipment. They can be removed without damage to the building and are excluded from assessment.

The catwalks and special stairways are stairwells which, unlike the regular stairways in Steel's office buildings, are not built into the buildings but are mounted thereto. They provide necessary access to the

cranes and other equipment, but are not part of the manufacturing process. They should be assessed.

The blast furnace cast houses are actually parts of the blast furnaces and provide shelter for the furnace equipment and overhead platforms and channels for the flow of hot molten iron from the blast furnaces into cars for transport to the open hearth furnaces. These facilities should be excluded under *Jones & Laughlin*.

The orders of the court below are modified and the case remanded for entry of orders in conformity with this opinion.